ELECTRONIC DESIGN AND MANUFACTURING, INC., Plaintiff and Counterdefendant-Appellant, v. JOHN G. KONOPKA *et al.*, Defendants (John G. Konopka, Counterplaintiff-Appellee; Anthony Trocano *et al.*, Counterdefendants).

First District (5th Division)   No. 1—94—2204

Opinion filed April 28, 1995.

Robert T. Palmer, of Garfield & Merel, Ltd., of Chicago, for appellant.

Daniel R. Harper and Edmund P. Boland, both of Carey, Filter, White & Boland, of Chicago, for appellee.

JUSTICE T. O'BRIEN delivered the opinion of the court:

Plaintiff-counterdefendant Electronic Design & Manufacturing, Inc. (EDM), appeals from an order of the circuit court compelling EDM to turn over certain die molds and other production work to defendant-counterplaintiff John G. Konopka (Konopka). The turn-over order was in connection with the purported termination of an exclusive licensing agreement for the manufacture and marketing of a patented electronic device called the "Circuit Locator." EDM contends that the circuit court erred in granting a mandatory pre-liminary injunction which altered the status quo. We agree and reverse the order of the circuit court.

## BACKGROUND[1]

EDM is an Illinois corporation engaged in the design, manufacture and distribution of various electronic devices on behalf of itself and others. Konopka is the inventor of the Circuit Locator, a device used to identify the precise breaker switch supplying electricity to either an AC outlet or an incandescent light fixture without the interruption of power. Ability International, Inc., a codefendant and a nonparty to this appeal, is also a manufacturer of electronic devices and is responsible for introducing EDM and Konopka.

On April 22, 1991, EDM and Konopka entered into a one-page written agreement regarding the manufacture, marketing and sale of the Circuit Locator. The agreement provided in pertinent part:

> "1. John Konopka agrees to work exclusively with EDM Inc. as the Manufacturer and Marketer, for a period of five years, providing the product quality and delivery remain satisfactory.
>
> * * *
>
> 2. EDM agrees to compensate in following [sic] manner:

---

[1]The following background was adduced from the testimony and exhibits admitted into evidence at the two hearings for preliminary injunction held before the Honorable Aaron Jaffe on November 3, 1993, and May 31, 1994. We caution that these "facts" do not constitute final "findings" and therefore should not be viewed as binding should this matter proceed to a trial on the merits.

2.1. To John Konopka, 7% and to Ability International Inc. 2.5% of her [*sic*] net sales of this product within 10 days of collection of the shipment monthly.

\* \* \*

2.3. EDM guarantees to sell a minimum of 250,000 units by the end of 1992. If she [*sic*] fails, she [*sic*] will transfer all tooling, and product specification and artwork with customer accounts at no cost to John Konopka."

Thereafter, EDM placed a special purchase order for the molds, that is, the plastic enclosures to be used in housing the Circuit Locator, as well as certain other components or "hard tooling." EDM bore the expense of obtaining the molds and other production work at a cost of approximately $30,000 to $40,000.

Once production commenced, EDM began to market the Circuit Locator to various subdistributors such as Radio Shack, Inc. By the end of 1992, EDM had sold approximately 50,000 to 60,000 units. During this period, and for the first half of 1993, Konopka received royalty payments pursuant to the terms of the agreement.

Nevertheless, on June 22, 1993, an attorney retained by Konopka sent a letter to EDM indicating that the agreement was terminated. Specifically, the letter stated in relevant part:

"You are hereby notified that, effective immediately, the Agreement is terminated due to failure on the part of EDM to fulfill its obligations thereunder, including but not limited to, failure to sell a minimum of 250,000 units of the Circuit Locator by year end 1992 and failure to pay Ability International, Inc.

You are further directed to cease and desist from further manufacturing and marketing of any product protected by U.S. Patent No. 4,906,938. Please transfer to John Konopka all tooling, products [*sic*] specification and art work with customer accounts pursuant to the Agreement."

Approximately four months later, EDM filed a single-count complaint for declaratory judgment. The complaint sought, among other things, an expedited declaration that EDM had the exclusive right under the agreement to manufacture, market and sell the Circuit Locator. Konopka filed an answer, an affirmative defense and a three-count counterclaim. Count I of the counterclaim requested a declaratory judgment that the termination notice of June 22, 1993, was valid and proper and that EDM no longer had any right or interest in the Circuit Locator. Counts II and III asked for, respectively, an accounting and injunctive relief.

On October 28, 1993, EDM filed an emergency motion for temporary restraining order and preliminary injunction. EDM claimed that Konopka was estopped from terminating the agreement for failure to meet the minimum sales requirements because Konopka accepted payments in 1993 and continued to allow EDM to sell the Circuit Locator knowing that the sale requirements for 1992 had not been met. The motion asked the court to enjoin Konopka and his new distributor, GSA Systems, Inc. (GSA), from manufacturing and selling Circuit Locators. The motion also sought to prevent Konopka from interfering with EDM's own delivery of product orders.

The circuit court subsequently conducted an evidentiary hearing beginning on November 3, 1993. At the hearing, Anthony Trocano, the president of EDM, testified that sometime in 1992 he began discussions with Zircon Company (Zircon), another electronics firm, in order to secure assistance in marketing the Circuit Locator. Trocano further testified that he advised Konopka of these discussions in October or November of that same year and that Konopka allegedly told him to "continue negotiating, but don't sign him (Zircon) to any agreement." According to Trocano, Konopka was apparently concerned that Zircon would circumvent both EDM and Konopka by licensing the product directly from Zenith Electronics, Inc. (Zenith), a corporation which also claimed patent rights to the Circuit Locator. Konopka allegedly told Trocano that he would not enforce the 1992 sales quota in light of his recommendation not to sign Zircon to an agreement.

Evidence at the hearing further disclosed that, despite the failure to satisfy the 1992 sales quota, EDM continued to make and sell Circuit Locators in 1993. The evidence also showed that Konopka continued to receive and cash the resulting royalty checks.

Konopka, on the other hand, testified that any discussions with EDM about Zircon did not begin until early 1993. He further stated that although he had expressed concerns that Zircon would deal exclusively with Zenith, he never told Trocano not to proceed with negotiations. Moreover, Konopka did not tell Trocano that he intended to waive the 1992 minimum sales quota.

Meanwhile, Konopka, apparently unbeknownst to EDM, began negotiating with another distributor (GSA) in April 1993 regarding a license to manufacture and sell Circuit Locators. Konopka shortly thereafter terminated EDM's exclusive licensing agreement on June 22, 1993, and then entered into a new agreement with GSA.

At the close of EDM's case in chief, Konopka successfully moved for a directed verdict. In denying EDM's motion for preliminary injunctive relief, the court stated:

"I find the Plaintiff's case wanting in at least three of those places [*i.e.*, the four traditional elements for preliminary injunctive relief] and the first place is protectable [*sic*] right or protectable [*sic*] interest. It seems to me that in order to establish that right, I think that you have to show that there was an oral modification of the written Agreement and I don't think that you have done it. I don't even think that the Plaintiff's testimony does it. Basically Plaintiff's testimony is as follows. He says that he talks to Mr. Konopka and they talk about potential customers, and he accepts them in November of 1992, and understanding we have to look at the Agreement, EDM guarantees to sell a minimum of 250,000 by the end of 1992. If he fails, he will transfer all tooling and products, specifications, and artwork with customers accounts at no cost to John Konopka. That clearly is a termination agreement. I don't know how it could really be more clear than that."

Approximately four months later, Konopka filed his own "motion for preliminary injunction." Originally, the motion sought (i) to enjoin EDM and its president, Anthony Trocano, from soliciting, selling, manufacturing and distributing the Circuit Locator; (ii) to require Star Die Molding, Inc. (nonparty to this appeal), to turn over the hard tool case used in manufacturing the molds; (iii) to declare that Konopka's agreement with EDM was properly terminated; and (iv) to compel EDM to turn over any molds in its possession. The circuit court set the matter for hearing on May 31, 1994.

Prior to the hearing, however, Konopka learned through discovery that Star Die Molding was no longer in possession of the hard tool case and further that EDM was in fact selling a different product from the Circuit Locator. Therefore, Konopka amended his motion for preliminary injunction on May 27, 1994, to request only a declaration that the agreement was properly terminated and an order requiring EDM to turn over the molds.

The circuit court heard Konopka's amended "motion for preliminary injunction" on the following week. During the hearing, the parties argued extensively on whether this second hearing consisted of a motion for preliminary injunction or, in essence, a bifurcated trial limited to the issue of termination. The court, however, never directly ruled on the issue.

In any event, the parties orally stipulated to the evidence adduced at the previous hearing on EDM's motion for preliminary injunction, and then produced scant additional evidence. The court took the matter under advisement and later issued an oral ruling on June 28, 1994. The court declared once again that paragraph 2.3 was a "termination agreement" and that Konopka properly terminated the agreement with EDM. The court also ordered EDM to turn over

the molds, production work and customer accounts. EDM then filed this interlocutory appeal pursuant to Supreme Court Rule 307(a)(1). 134 Ill. 2d R. 307(a)(1).

## OPINION

The dispositive issue on appeal, and one which dictates the scope of our review, is whether the circuit court's order requiring the turnover of the molds and production work is a preliminary injunction or, rather, a final judgment after a trial on the merits. If the order is a preliminary injunction, we must determine whether the circuit court abused its discretion in granting a mandatory preliminary injunction which not only altered the status quo, but also awarded the ultimate relief in the case. On the other hand, if the order is a final judgment, we merely consider whether the circuit court's finding that the agreement was properly terminated was contrary to the manifest weight of the evidence.

■ At the outset, we note that a proceeding pursuant to a preliminary injunction, unlike a trial on the merits, generally consists of an abbreviated evidentiary hearing on an emergency basis. The "findings" of a court under these circumstances do not carry with them the preclusive effect of *res judicata*. The parties, therefore, are not foreclosed from offering additional evidence at the final trial in the case. In addition, the relief available under a preliminary injunction is provisional in nature. Thus, courts are prohibited from issuing an order that alters the status quo.[2]

Due to these differences, it is imperative that a party proceeding under a "motion for preliminary injunction" be put on sufficient notice prior to the commencement of the hearing that the matter before the court is a trial on the merits and not a preliminary injunction. Indeed, the minimum requirements of due process mandate as much. As Justice Bilandic stated in *Lily of the Valley Spiritual Church v. Sims* (1988), 169 Ill. App. 3d 624, 629, 523 N.E.2d 999:

> "It has been held that notice given after the conclusion of the hearing for temporary relief, that may result in a permanent injunction, is insufficient and raises due process concerns. (*Gellman v. State of Maryland* (4th Cir. 1976), 538 F.2d 603.) Although there may be no indication that the party would have produced further testimony if notified earlier that the entire case would be disposed of after a single hearing, this does not sanction the court

---

[2]Status quo is uniformly defined as the last, actual, peaceable, uncontested status preceding the controversy. Such is the definition of status quo in theory. In practice, status quo has been the subject of countless, often inconsistent, interpretations.

changing, *sub silentio*, the nature of the game at halftime. *T.M.T. Trailer Ferry, Inc. v. Union de Tronquistas de Puerto Rico, Local 901* (1st Cir. 1971), 453 F.2d 1171, 1172."

■ In the instant case, we find that EDM was not put on sufficient notice of a trial on the merits to justify the granting of the ultimate relief in the case. Here, Konopka noticed for hearing a preliminary injunction in which he sought to enjoin EDM from manufacturing and distributing the Circuit Locator, to require Star Die Molding to turn over the hard tool case, to declare Konopka's agreement with EDM terminated, and to compel EDM to turn over any molds in its possession. On the Friday of the week preceding the hearing, *i.e.*, one court day prior to the hearing, Konopka narrowed his prayer for relief so as to seek only a declaration that the agreement was properly terminated and an order compelling EDM to turn over the molds.[3]

The transcript of proceedings in this case, however, bears witness to the fact that EDM was not sufficiently notified that Konopka intended to try the case to the merits, particularly where the title of the motion still referred to a preliminary injunction and Konopka still sought some injunctive relief. For instance, during a discussion over the preclusive effect of the court's "findings" at the hearing on EDM's motion for a preliminary injunction, counsel and the court undertook the following colloquy:

"MR. PALMER [Counsel for EDM]: *** That's not the law of the case. This is a separate preliminary hearing, but I see no reason why we should not use those facts to the extent we can. ***

THE COURT: So today we're here for a preliminary injunction, is that correct?

MR. PALMER: Yes, sir.

MR. HARPER [Counsel for Konopka]: Well, the scope of the proceedings is somewhat narrowed, Your Honor. We've withdrawn that part of our motion that sought to enjoin EDM from manufacturing or selling the circuit locator product that they are now selling.

* * *

MR. PALMER: *** Your Honor, I don't—as I mentioned a minute ago, I do not take the position that there is any determination of law that is binding on this proceeding. This is a separate preliminary hearing in which the burden of proof is on Mr. Konopka. He seeks different relief than we sought. *** I'm willing to stipu-

---

[3]We note parenthetically that requesting a declaration of rights pursuant to a motion for preliminary injunction itself raises procedural concerns.

late to the facts, and it well may be that Your Honor makes the same determination of law, but I'm not prepared to concede that you may not make any other. I believe you are free in any preliminary matter—."

Likewise, EDM's counsel reiterated during closing arguments his understanding that the hearing before the court was a preliminary injunction. He stated, "If it please the Court, the relief being sought here today is that rarest and most hated form of equitable relief, the preliminary mandatory injunction. It seeks relief which alters the *status quo*, and requires somebody to do an affirmative act prior to a final hearing on the merits." Counsel then engaged in a lengthy discussion of the traditional elements of a preliminary injunction.

Nevertheless, the circuit court did not indicate to counsel that the matter on the call was a trial on the merits. Under these circumstances, we find that the hearing before the circuit court was in fact a preliminary injunction as noticed. Indeed, it is elementary that an interlocutory or interim request for the turnover of the molds prior to resolution of the substantive issues on the merits constitutes a request for a preliminary injunction.[4]

Consequently, we must reverse the order of the court compelling EDM to turn over to Konopka the molds, production work and customer accounts. The absence of an extreme emergency in this case fails to justify the court's order of a mandatory preliminary injunction, especially where the conduct which led to the purported termination of the contract occurred in 1992 and the preliminary injunction was not sought until 1994.[5]

Finally, we remind counsel who engage in litigation of an emergency nature that they have an added duty not only to follow the procedural rules designed for emergency relief, but also to give the court and opposing counsel sufficient notice of the nature of the proceedings to be heard. Judges holding assignments in high volume courts that entertain numerous emergency matters should not have to fathom the nature of the relief sought by the parties in the middle

---

[4]Konopka at times characterizes the circuit court proceeding as a hearing on a "motion for turnover," presumably pursuant to section 2—1402 of the Code of Civil Procedure (735 ILCS 5/2—1402 (West 1992)). This, of course, presupposes a final determination on the merits, the very issue on appeal, and therefore does not materially advance the argument.

[5]In light of our holding, we need not address whether the circuit court erred in *impliedly* finding that Konopka did not waive the 1992 sales quota requirement either by oral modification *or* by allowing EDM to continue to manufacture and sell Circuit Locators for the first six months of 1993 and by cashing the resulting royalty checks.

of a hearing. Simply put, lawyers that seek emergency relief, and thus have their controversy heard ahead of those matters already set for trial, have the obligation to present their case in an efficient and orderly manner.

In this regard, we note that EDM waited four months after being put on notice of Konopka's alleged termination of the agreement before filing a "petition for expedited declarations of his rights." Moreover, the court apparently set aside its regular trial call to give EDM an expedited hearing. Then, after EDM did not prevail on its requested preliminary relief, Konopka waited an additional four months thereafter to file *his* own motion for preliminary injunction, only to attempt to convert it into a declaratory judgment at the last moment.

The accommodating trial judge—no doubt burdened with a predictably heavy schedule—was entitled to an orderly presentation pursuant to the rules. Due to both counsel's attempts to put a "square peg in a round hole," much judicial time and effort has been wasted with precious little result.

For the foregoing reasons, we reverse the order of the circuit court and remand for further proceedings consistent with this opinion.

Reversed and remanded.

COUSINS, P.J., and McNULTY, J., concur.